## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RONALD PASQUALE; COLLEEN PASQUALE,**<br><br>                    Plaintiffs,<br><br>v.<br><br>**INFLUENTIAL PARTNERS, LLC.; PATRICIA A. FITZ GERALD, ESQ.; JACK SWIFT; and JOHN DOES 1-25,**<br><br>                    Defendants. | Civil Case No.: 16-00012<br><br><br>**SECOND AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.      This action arises out of Influential Partners, LLC's, Patricia A. Fitz Gerald, Esq.'s, and Jack Swift's ("Defendants") abusive, unconscionable, deceptive, and fraudulent conduct in connection with a mortgage transaction entered into between Defendant Influential Partners and Plaintiffs Ronald Pasquale and Colleen Pasquale ("Pasquales").

2.      On March 18, 2010, Defendant Influential Partners issued a six-month mortgage loan at a 26% interest which a balloon payment 400 times greater than the previously scheduled payments.

3.      At the time of its issuance, and in the mortgage documents, Defendant Influential Partners misleadingly claiming that the mortgage actually had a 14%

interest rate.

4.     Defendant Influential Partners neglected to provide any of the disclosures required by the Truth in Lending Act, 15 U.S.C. § 1602, *et seq.* ("TILA").

5.     Defendant Influential Partners failed to confirm the Pasquales' ability to repay this mortgage loan prior to issuing the loan, in violation of TILA, as amended by 12 CFR § 226.34.

6.     Defendant Jack Swift helped facilitate this abusive and unconscionable mortgage, and put undue pressure on the Pasquales to sign the loan without a full and fair opportunity to review and evaluate its terms, and without disclosing that he stood to benefit from the new mortgage.

7.     These acts, failures to act, omissions, concealments, as well as the mortgage terms themselves violate the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("CFA").

8.     Accordingly, the mortgage contract also violates New Jersey's "Truth-in-Consumer Contract Warranty and Notice Act ("TCCWNA"), N.J.S.A. § 56:12-15, which states, in relevant part, that "[n]o creditor [or] lender … shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract … which includes any provision that violates any clearly established legal right of a consumer or responsibility of a … creditor [or] lender …

as established by State or Federal law at the time the offer is made or the consumer contract is signed[.]"

9.     On September 3, 2015, Defendant Fitz Gerald sent to the Pasquales a Notice of Intention to Foreclose because the Pasquales had failed to make the payments called for in the March 18, 2010 mortgage. Defendant Fitz Gerald's letter violates the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), because it sought to collect an amount to which Defendant Influential Partners was not lawfully entitled (as a result of the unconscionable terms set forth above), and because it stated that the Pasquales could call Defendant Fitz Gerald's office to dispute the debt.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the FDCPA claim under 28 U.S.C. § 1331, as this action arises under the FDCPA, which is a federal statute.

11.     This Court also has subject matter jurisdiction over the CFA and TCCWNA claims because each claim contain substantial issues of federal law which are necessarily raised, actually disputed, and capable of resolution in federal court without disrupting the federal-state balance.

12.     If necessary, the Court also has supplemental jurisdiction over the CFA and TCCWNA claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over Defendants because

Defendants reside in this District, conduct significant amounts of business transactions within this District, and because actions giving rise to this complaint were directed at this District.

14.   Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs reside in this district.

## PARTIES

15.   Plaintiff Ronald Pasquale is, and at all times mentioned herein was, a resident of Brick Township, New Jersey.

16.   Plaintiff Colleen Pasquale is, and at all times mentioned herein was, a resident of Brick Township, New Jersey.

17.   Defendant Influential Partners, LLC is, and at all times mentioned herein was, a New Jersey limited liability company.

18.   Defendant Patricia A. Fitz Gerald, Esq. is, and at all times mentioned herein was, an attorney licensed to practice in, engaging in practice in, and residing in New Jersey.

19.   Defendant Jack Swift is, and at all times mentioned herein was, a citizen and resident of New Jersey.

## PLAINTIFF'S FACTS

20.   In December 2004, the Pasquales purchased a home in Brick, New Jersey for $350,000 -- $80,000 down payment and a $270,000 mortgage from

Countrywide.

21.     However, as this mortgage was an adjustable rate mortgage, the rate eventually increased to a level at which the Pasquales could not afford the payments.

22.     In March 2007, the Pasquales refinanced with Countrywide Home Loans for $383,000 ("Countrywide Mortgage"), which rolled in the $270,000 mortgage, a previous refinance, and several prior home equity lines of credit used for home renovations.

23.     Also in 2007, Ronald Pasquale lost his job and the Pasquales fell behind on the Countrywide Mortgage.

24.     In February 2008, the Pasquales received a "Notice of Intention to Foreclose" from Countrywide, requesting $12,463.56 to "cure" the default.

25.     In need of assistance making such payments, and in staying current for the foreseeable future, the Pasquales went to The Money Store in an effort to get a loan.

26.     The Money Store, which was at the time closing its New Jersey branches, referred the Pasquales to Jack Swift of JBS Investments in Fords, New Jersey.

27.     On March 12, 2008, Defendant Swift provided a $35,000 subordinate mortgage loan ("Swift Mortgage") to the Pasquales at 14% interest, to be repaid within one year, and with all interest ($5,158.61) paid in advance out of the proceeds

of the loan.

28.     James T. Murphy, Esq. served as the settlement agent for this loan.

29.     Defendant Swift did not provide the Pasquales with any of the required disclosures under the Truth In Lending Act, nor did he inquire into their ability to repay the mortgage.

30.     While negotiating Defendant Swift told the Pasquales that new terms could be discussed after 1 year.

31.     Defendant Swift lied. Defendant Swift had no intention of renegotiating or discussing terms.

32.     On March 12, 2008 – the same day Defendant Swift issued the mortgage to the Pasquales – Defendant Swift assigned the mortgage to Church Alive, Inc. d/b/a Randolph Christian Church.

33.     As it turned out, Church Alive, Inc. was investigated by and entered into a consent order with the New Jersey Department of Law and Public Safety, Division of Consumer Affairs, for actively defrauding congregants by using donations pledged for a building fund for the own personal gain of the pastors.

34.     This fraud occurred during the same time period during which Defendant Swift and Church Alive, Inc. coordinated the Swift Mortgage.

35.      Given this quick assignment, it appears that Defendant Swift had an ongoing relationship with Church Alive, and coordinated with Church Alive to

deceive the Pasquales into entering into this mortgage.

36.    It further appears that Defendant Swift illegally rolled a full year of interest into the loan with plans to immediately "cash out." It was thus in Defendant Swift's interest to push a loan without doing any inquiry into the Pasquales' ability to pay.

37.    James T. Murphy, Esq. prepared the assignment from Defendant Swift to Church Alive, Inc.

38.    Ultimately, from the $35,000 Swift Mortgage, the Pasquales received $26,290.89, which was deposited into the Pasquales personal bank account.

39.    Subsequently, using the money from the Swift Mortgage, the Pasquales made the following payments to Countrywide:

| Date | Amount | Month Payment Was Due |
|------|--------|-----------------------|
| March 24, 2008 | $2,971.47 | November, 2007 |
| March 25, 2008 | $2,971.47 | December, 2007 |
| April 7, 2008 | $2,971.47 | January, 2008 |
| May 19, 2008 | $2,971.47 | February, 2008 |
| August 20, 2008 | $2,971.47 | March, 2008 |
| August 20, 2008 | $199.53 | March, 2008 |
| August 20, 2008 | $2,971.47 | April, 2008 |

| August 20, 2008 | $2,971.47 | May, 2008 |
| --- | --- | --- |
| August 20, 2008 | $2,971.47 | June, 2008 |
| August 20, 2008 | $3,066.50 | July, 2008 |
| August 20, 2008 | $2,194.27 | August, 2008 |
| August 20, 2008 | $767.28 | August, 2008 |

40.     As shown above, the Pasquales paid over $29,000 to catch up on their Countrywide Mortgage, which was the entire stated purpose of obtaining the Swift Mortgage.

41.     At no point before, during, or after entering into the Swift Mortgage did the Pasquales tell anyone associated with the Swift Mortgage that the proceeds would be used for anything related to any business.

42.     None of the proceeds were actually used for business purposes.

43.      Any contention that the Swift Mortgage is a "business loan" is a recent fabrication.

44.     This is evidenced not only by the timing of the loan and payments made on the Countrywide Mortgage, but also that the Swift Mortgage is recorded with MLS as a "Construction Loan."

45.     Accordingly, the primary purpose of the Swift Mortgage was to pay off a previous indisputable consumer credit transaction, making the Swift Mortgage a

"consumer credit transaction," as it was used primarily for personal, family, or household purposes.

46.     In light of the draconian terms of the Swift Mortgage and the Pasquales financial situation, the Pasquales had become delinquent on the Swift Mortgage.

47.     In late 2009/early 2010, Defendant Swift visited the Pasquales at their home to urge them to pay off the Swift Mortgage, threatening foreclosure if they could not do so.

48.     Defendant Swift failed to mention during this visit that he no longer owned the loan.

49.     Nor did Defendant Swift tell the Pasquales that he no longer owned the loan during any previous conversations.

50.     To facilitate repayment, Defendant Swift, still acting as if he owned a loan he no longer owned, found an entity willing to issue a new loan for the balance due under the Swift Mortgage: Defendant Influential Partners.

51.     Defendant Swift informed the Pasquales that the only way to avoid foreclosure on the house due to the delinquent Swift Mortgage was to execute the new loan immediately at the Pasquales' home with Mr. Swift's attorney, Defendant Fitz Gerald.

52.     Defendant Swift had no power to threaten foreclosure as he no longer owed the loan. By doing so, Defendant Swift placed undue pressure on the Pasquales

to take out a new loan that was against their interests.

53.    Defendant Swift insisted that the process for this refinancing be expedited, depriving the Pasquales of any chance to have the loan meaningfully reviewed by a neutral attorney.

54.    In fact, Defendant Swift sought to have his own attorney, James T. Murphy, who had served as the settlement agent for the Swift Mortgage and who prepared the same-day assignment to Randolph Christian Church, represent the Pasquales in the refinance process.

55.    In a letter to the Pasquales dated February 3, 2010, Mr. Murphy wrote:

> Jack Swift has told me you wish me to represent you in the refinance of your existing second mortgage. That's all well and good, but I need you to confirm, so that I am officially hired by you, and not Mr. Swift. I have been given the following initial breakdown of the proposed proceeds, and Mr. Swift is trying to get the new lender to come up with some additional funding ( so [sic] that your desire for some cash takeout can occur)[.]

56.    Despite Mr. Murphy's recent fabrications to this court, there is no mention or indication in either letter that he believed the Pasquales were seeking a loan for business purposes, instead referring to it as a "refinance."

57.    During a late night visit to the Pasquales' home in connection with the refinancing, Defendant Fitz Gerald represented to the Pasquales that the payments would be $121.83 per month, never clarifying that the loan was to be repaid in full in six months.

58.     Upon information and belief, Defendant Fitz Gerald was one of the architects of the fraudulent loan terms. She prepared the mortgage documents listing the terms. She and Defendant Swift's company JBS Investments have the same office address in Fords, New Jersey. Furthermore, the terms and format of the Swift Mortgage and the IP Mortgage are similar, including identical "14%" interest rates.

59.     Taking Defendant Swift's threats of foreclosure seriously (threats he had no authority to make, as he was no longer the owner of the Swift Mortgage), and as a result of Defendant Fitz Gerald's lack of disclosures, the Pasquales signed the new subordinate mortgage with Defendant Influential Partners ("IP Mortgage") during this late night visit.

60.     At no point before, during, or after entering into the IP Mortgage did the Pasquales represent to anyone associated with the IP Mortgage that the proceeds would be used for business purposes. Any such contentions are recent fabrications.

61.     The Pasquales sole purpose in refinancing the Swift Mortgage was to stave off foreclosure and remain in their home, which they have fought hard and consistently to do since the beginning and continuing through to today.[1]

62.     Defendants' fabrications, like many fabrications, are illogical and contradict Defendants' contemporaneous actions and statements.

---

[1] The Pasquales have completed the mortgage modification process and have been current on their mortgage, serviced by Seterus, for over a year.

63.    Out of the $49,500 IP Mortgage, the Pasquales only received $2,317.94. $40,222.08 went to pay off the Swift Mortgage, and the remainder was rolled-in interests, points, and other fees.

64.    If the Pasquales wanted $2,317.94 for business (they did not), they would not have entered into a $49,500 mortgage to accomplish this goal.

65.    Nor did Defendants believe at the time that the loan was for "business purposes."

66.    On February 2, 2010, Defendant Swift (using the email address jbs4562@aol.com) sent an email to Mr. Murphy, summarizing the loan terms and also writing:

> The Pasquale's[sic] asked for some cash out of the refinance, maybe $3,000, but unless Dennis is willing to increas[sic] the loan I donn't[sic] see how that is possible.

67.    Similarly, in the February 3, 2010 email from Mr. Murphy to the Pasquales, mentioned *infra* in ¶ 55, Mr. Murphy wrote that "Mr. Swift is trying to get the new lender to come up with some additional funding … but, to date, it seems that he will not budge."

68.    Mr. Murphy then went on to describe the terms of the refinance.

69.    While it is significant that neither Defendant Swift nor Mr. Murphy mentioned any business purpose, it is more significant because it shows the original plan for the IP Mortgage would have *no* cash takeout.

70.     Put another way, if the Pasquales sought to refinance in order to receive cash for business purposes, the fact that this cash takeout was not likely would have made the refinance pointless. Yet one month prior to the execution of the refinance, Defendants had come up with the terms and were operating under the assumption that the refinance would proceed even without any cash takeout.

71.     Furthermore, that Defendant Swift summarized the IP Mortgage terms for Mr. Murphy indicates that Defendant Swift was another architect of the unconscionable loan terms.

72.     Even assuming *arguendo* that the Pasquales took the $2,317.94 and spent it all on business (they did not), the remaining $47,182.06 was clearly not related to business, nor could it have been.

73.     The primary purpose of the IP Mortgage was to stave off Defendant Swift's threatened foreclosure on the Swift Mortgage, which, again, he no longer actually owned.

74.     Even looking at the loan amount beyond the $40,222.08 needed to pay off the Swift Mortgage, the majority of those funds were paid to Defendant Influential Partners in illegally-rolled-in interest, points, and fees.

75.     Accordingly, the IP Mortgage was a "consumer credit transaction" as it was used primarily for personal, family, or household purposes.

## Abusive and Unconscionable Terms of the IP Mortgage

76.     The IP Mortgage is a "high-cost mortgage" under the Truth in Lending Act and its amendments, the Home Ownership and Equity Protection Act, because "the annual percentage rate at consummation of the transaction [exceeded] by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor." The yield on 6-month treasury securities on January 15, 2010 was 0.15%. The 26% interest rate exceeds this rate by significantly more than 10%. 15 U.S.C. § 1602(aa) (2009).[2] It is also therefore a "high-cost home loan" under the Home Owners Security Act ("HOSA"), N.J.S.A. § 46:10B-22.

77.     Unfortunately, the IP Mortgage was abusive and unconscionable in myriad ways. Specifically:

a.  Defendants Influential Partners and Fitz Gerald failed to disclose the actual APR, using that term, which would violate 15 U.S.C. § 1639(a)(2). Upon information and belief, Defendants failed to disclose the actual APR because it would have alerted the Pasquales to the

_____

[2] The IP Mortgage would also qualify as a high-cost mortgage using the definition that took effect July 21, 2010 (after the IP Mortgage note was signed). The amendment states that a subordinate mortgage is a high-cost mortgage if "the [APR] at consummation of the transaction … exceeds by more than 8.5 percentage points the average prime offer rate … for a comparable transaction." 15 U.S.C. § 1602(bb). The average prime offer rate on a one-year fixed rate transaction on March 15, 2010 was 5.34%. There is no published average prime offer rate on a six-month fixed rate transaction.

egregious terms of the loan.

b. Defendants Influential Partners and Fitz Gerald failed to make any of the required disclosures under 15 U.S.C. § 1638 (including, but not limited to, "the amount financed," using that term; the "finance charge", using that term; the "annual percentage rate," using that term; descriptive explanations of those terms). Defendants failed to make these disclosures because such disclosures would have alerted the Pasquales to the unconscionable loan terms.

c. The regular periodic payments called for under the IP Mortgage would not fully amortize the outstanding principle balance, instead requiring payments of $121.83 for five months and then a payment of $49,621.83 in the sixth month. This would violate 15 U.S.C. § 1639(e).

d. The IP Mortgage consolidated and paid in advance $2733.98 in interest in advance, an amount equivalent to over 22 regular periodic payments. This would violate 15 U.S.C. § 1639(g) and N.J.S.A. § 46:10B-26(d).

e. Defendants Influential Partners and Fitz Gerald made the IP Mortgage "without regard to a consumer's repayment ability as of consummation." This would violate 15 U.S.C. § 1639(h), as amended by 12 CFR § 226.34.

f. Defendants Influential Partners and Fitz Gerald made a high-cost loan

to a borrower who financed points and fees without first receiving certification from a third-party nonprofit credit counselor. This would violate N.J.S.A. § 46:10B-26(g).

g. The Pasquales paid $2,970 in points for this mortgage, and were charged $3465 in interest over 6 months, for a total of $6435 in interest in six months on a $49,500 loan. This is an effective interest rate of 26%. This far exceeds New Jersey's maximum interest rate of 16%. N.J.S.A. § 31:1-1 and is usurious. This would have been disclosed had Defendants complied with the "APR" disclosure requirement in ¶ 77(a).

h. The IP Mortgage contains a scheduled payment twice as large as the average of earlier scheduled payments (as outlined in ¶ 77(c)). This would violate N.J.S.A. § 46:10B-26(a).

i. The IP Mortgage contains financed points and fees in excess of 2% of the total loan amount. This would violate N.J.S.A. § 46:10B-26(l).

j. The IP Mortgage calls for a late fee for amounts past due for 10 days. This would violate N.J.S.A. § 46:10B-25(d)(2), which prohibits charging a late fee for amounts past due less than 15 days.

k. The IP Mortgage fails to include the "NOTICE TO BORROWER" mandated by N.J.S.A. § 46:10B-26(f).

l. On the IP Mortgage note itself, there are dozens of X's typed over terms

in the note, primarily near key terms, which diverts attention from those key terms.

78.    While Plaintiffs do not seek at this time damages directly under N.J.S.A. § 46:10B *et seq.* or 15 U.S.C. § 1602, *et seq.*, violations of a statute can serve as evidence of unconscionable practices under the Consumer Fraud Act. *Lemelledo v. Beneficial Management Corp. of America*, 289 N.J. Super. 489, 502 (App. Div. 1996), *aff'd* by *Lemelledo v. Benefit Mgmt. Corp.*, 150 N.J. 255 (1997).

79.    Even if the practices outlined in ¶ 77(a-m) were not in violation of another statute, many of them are so egregious as to be independently unconscionable under the CFA.

80.    For example, a mortgage containing a balloon payment of $49,621.83 after payments of $121.83 would be unconscionable even if it did not independently violate another statute. ¶ 77(c).

81.    Similarly, rolling 22 periodic payments into the principle would be unconscionable in and of itself. ¶ 77(d).

82.    Similarly, lending $49,500 secured by someone's home, to be repaid in six months, without making any inquiry whatsoever into the ability of the borrower to pay would be unconscionable in and of itself. ¶ 77(e). Such a tactic amounts to nothing more than theft of equity (and potentially a home).

83.    In addition to the above, ¶¶ 77(g), (h), (i), and (j) would also

independently violate the CFA, even if they did not violate any other statutes.

84.     As set forth above, Defendants also concealed material facts (that they were mandated by law to disclose) with the intent the Pasquales would rely on such concealment.

85.     The Pasquales were confused and misled by Defendants and the IP Mortgage's terms, and had the appropriate and legally-mandated disclosures been made, or had appropriate attention been drawn to the terms, the Pasquales would never have entered into the IP Mortgage.

86.     Furthermore, because these provisions and lack of disclosures violated the Pasquales clearly established rights, as well as Defendant Influential Partner's responsibilities, the IP Mortgage also violates the TCCWNA.

87.     The Pasquales have suffered actual and ascertainable damages, in the form of loss of over $84,451.96[3] in equity of their home as a result entering into a loan they would not have entered into had the appropriate disclosures (including those about the illegal terms) been made.

88.     However, Defendant Influential Partners has recently represented to this Court that is has waived all claims to any amounts beyond $42,540.02.

89.     To the extent this is preclusive on Defendant Influential Partners later

---

[3] The balance as of September 3, 2015.

changing its mind, the Pasquales have nonetheless suffered actual and ascertainable damages, in the form of loss of $42,540.02 in equity in their home as a result of entering into an unconscionable loan that they would not have entered into had Defendants not knowingly concealed material facts.

90.    In addition, Defendant Influential Partner's decision to waive the interest does not preclude the usurious interest rate, described in paragraph 77(g), from violating the TCCWNA, which looks at whether a contract provision violates a right or responsibility established by State or Federal law at the time the contract was signed. N.J.S.A. § 56:12-15.

91.    For violations of the CFA, the Pasquales are entitled to mandatory treble damages pursuant to N.J.S.A. § 56:8-19. For example, should it be found that the Pasquales were damaged in the amount of $84,451.96, they would be entitled to $253,355.88. Should it be found that the Pasquales were damaged in the amount of $42,520.02, they would be entitled to $127,560.06.[4]

92.    For violations of the TCCWNA, the Pasquales are entitled to actual damages or $100.00 in statutory damages, or both. N.J.S.A. § 56:12-17.

93.    The TCCWNA also gives consumers "the right to petition the court to

---

[4] Defendants unconscionable loan would not be "free money." Presumably, if the Court or a jury finds in Plaintiff's favor, the amount owed to Defendants would be offset from the amount owed to Plaintiffs. If Defendants did not want to face treble damages, they should not have issued a wildly unconscionable mortgage loan.

terminate a contract which violates" N.J.S.A. § 56:12-16. The Court has discretion to void the contract. N.J.S.A. § 56:12-17

94.   The Pasquales expressly request that the Court void the IP Mortgage contract.

95.   Under both the CFA and the TCCWNA, Pasquales are also entitled to attorney's fees and costs.

## **Defendant Fitz Gerald's Violations of the FDCPA**

96.   Making matters worse, Defendant Fitz Gerald twice threatened foreclose on the IP Mortgage.

97.   On August 16, 2013, Defendant Fitz Gerald sent a "Notice of Intention to Foreclose" on the IP Mortgage.

98.   On September 3, 2015, Defendant Fitz Gerald sent another "Notice of Intention to Foreclose" on the IP Mortgage through a "Notice of Intention to Foreclose."

99.   These notices are identical in content, other than the amounts due at the time of each Notice.

100.   This strongly suggests that Defendant Fitz Gerald maintains and uses form "Notice of Intention to Foreclose" letters.

101.   Both "Notices" state that "[i]f you disagree with our assertion that (1) a default has occurred or (2) the correctness of our calculation of the amount required

to cure the default, you may contact Patricia A Fitz Gerald, Esq. at [phone number]."
Exhibit A (September 3, 2015 Notice).

102.   However, the very next paragraph, and the law itself, requires disputes
to be in writing. *See* 15 U.S.C. § 1692g(b).

103.   The concluding paragraph again states that, should the Pasquales
dispute any portion of the debt, they should contact Defendant Fitz Gerald by phone.

104.   Defendant Fitz Gerald's statements that a debt could be disputed by
phone are deceptive and violate the FDCPA, 15 U.S.C. § 1692g. *See Caprio v.
Healthcare Revenue Recovery Group, LLC.*, 709 F.3d 142, 152 (3d Cir. 2013) ("We
therefore conclude that the collection letter was deceptive because it can be
reasonably read to have two or more different meanings, one of which is inaccurate,
i.e. that [debtor] could dispute the debt by making a telephone call.").

105.   Defendant Fitz Gerald also sought to collect an amount not authorized
by law, in violation of 15 U.S.C. § 1692f(1) and 1692e(2).

106.   Defendant Fitz Gerald is a debt collector as defined by 15 U.S.C. §
1692a(6), as she regularly collects or attempts to collect debts owed or due or
asserted to be owed or due another.

107.   That Defendant Fitz Gerald regularly engages in such collection
activity is evidenced by the fact that Defendant Fitz Gerald sent two identical form
letters to the Pasquales in connection with the IP Mortgage.

108.   It is unlikely that a business would take the time to create an automated form letter for something that it does not regularly do.

109.   Furthermore, Defendant Fitz Gerald included in her Notice of Intention to foreclose the "mini-Miranda" warning required *only* of those entities considered to be "debt collectors" under the FDCPA, writing "[t]his communication is an attempt to collect a debt and any information obtained will be used for that purpose."

110.   A defendant's use of the mini-Miranda has been found sufficient at the pleading stage to infer that the defendant is a debt collector. *See Crippen v. Stites*, 346 B.R. 115, 119 (Bankr. E.D. Pa. 2006).

111.   Accordingly, the Pasquales are entitled to $1,000 in statutory damages and attorney's fees, pursuant to 15 U.S.C. § 1692k.

## FIRST CLAIM FOR RELIEF
### Violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (Against Defendant Fitz Gerald)

112.   Plaintiffs incorporate the preceding paragraphs as if set forth herein.

113.   Defendant Fitz Gerald is a debt collector as defined by 15 U.S.C. § 1692a(6).

114.   On September 3, 2015, Defendant Fitz Gerald sent a Notice of Intention to Foreclose, seeking to collect $84,451.96.

115.   Because of the usurious interest rate, and the terms of the IP Mortgage loan described in ¶ 77, Defendant Fitz Gerald sought to collect an amount not

authorized by law, in violation of 15 U.S.C. § 1692f(1) and 1692e(2).

116.   Defendant Fitz Gerald also stated multiple times in the letter that the debt could be disputed by phone.

117.   Defendant Fitz Gerald's statements that a debt could be disputed by phone are deceptive and violate the FDCPA, 15 U.S.C. § 1692g. *See Caprio v. Healthcare Revenue Recovery Group, LLC.*, 709 F.3d 142, 152 (3d Cir. 2013) ("We therefore conclude that the collection letter was deceptive because it can be reasonably read to have two or more different meanings, one of which is inaccurate, i.e. that [debtor] could dispute the debt by making a telephone call.").

118.   The Pasquales have suffered actual damages in the form of invasion of their privacy and emotional distress.

119.   The Pasquales are entitled to statutory damages in the amount of $1,000, as well as reasonable costs and attorney's fees.

## SECOND CLAIM FOR RELIEF
### Violations of the New Jersey Consumer Fraud Act, 56:8-1 *et seq.*

120.   Plaintiffs incorporate paragraphs 1-111 as if set forth herein.

121.   The New Jersey Consumer Fraud Act applies to mortgage loans. *See, e.g.*, *Gonzalez v. Wilshire Credit Corp.*, 411 N.J. Super. 582, 592 (App. Div. 2010) *aff'd* 207 N.J. 557 (2011); *Associates Home Equity Servs. v. Troup*, 343 N.J. Super. 254 (App. Div. 2001).

122.   Both the Swift Mortgage and the IP Mortgage were of the type held out to the general public.

123.   Both the Swift Mortgage and the IP Mortgage were used primarily for personal or household purposes.

124.   As outlined above in, including, but not limited to, ¶ 77, the terms of IP Mortgage issued by Defendant Influential Partners, the circumstances surrounding its issuance, and the concealment of material facts pertaining to the IP Mortgage violate N.J.S.A. § 56:8-2.

125.   Defendant Influential Partners issued the IP Mortgage which contained the illegal and unconscionable terms.

126.   Defendant Influential Partners and Defendant Fitz Gerald concealed material facts with the intent that the Pasquales rely on such concealment, in violation of N.J.S.A. § 56:8-2.

127.   All Defendants placed undue pressure on the Pasquales by insisting on an expedited signing process which did not permit the Pasquales to retain an attorney to review the loan terms.

128.   Defendant Swift concealed the material fact that he no longer owed the loan that he placed undue pressure on the Pasquales.

129.   Defendant Swift threatened foreclosure, despite the fact he no longer owned the Swift Mortgage.

24

130.   Upon information and belief, Defendant Swift helped construct the unconscionable loan terms.

131.   The Pasquales are entitled to actual damages and have suffered ascertainable loss in the form of lost equity in their home and illegal fees and interest charges.

132.   The Pasquales are entitled to treble damages pursuant to N.J.S.A. § 56:8-19.

133.   The Pasquales are entitled to attorney's fees and costs.

134.   The Pasquales are further entitled to punitive damages.

**THIRD CLAIM FOR RELIEF**
**Violations of the TCCWNA, N.J.S.A. § 56:12-1**
**(Against Defendant Influential Partners)**

135.   Plaintiffs incorporate paragraphs 1-111 as if set forth herein.

136.   The TCCWNA states, in relevant part, that "[n]o creditor [or] lender … shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract … which includes any provision that violates any clearly established legal right of a consumer or responsibility of a … creditor [or] lender … as established by State or Federal law at the time the offer is made or the consumer contract is signed[.]" N.J.S.A. § 56:12-15.

137.   "Consumer contract" includes a written agreement in which an individual … (b) [o]btains credit [or] (d) [b]orrows money … for personal, family

or household purposes."

138.   As set forth above, the Pasquales obtained credit/borrowed money through the IP Mortgage for personal, family, or household purposes.

139.   The IP Mortgage is therefore a "consumer contract."

140.   The Pasquales are "consumers."

141.   Defendant Influential Partners is the creditor/lender for the IP Mortgage.

142.   The Pasquales and Defendant Influential Partners entered into a written consumer contract.

143.   As set forth in paragraph 77, the IP Mortgage contained provisions that violated the Pasquales' clearly established legal rights and Defendant Influential Partners' responsibilities.

144.   The Pasquales are therefore entitled to statutory damages of $100, regardless of whether any ascertainable loss is shown. N.J.S.A. § 56:12-17.

145.   The Pasquales are also entitled to any actual damages. *Id.*

146.   The Pasquales are also entitled to attorney's fees and costs. *Id.*

147.   The Pasquales are also entitled to, and hereby do, petition the Court to terminate the IP Mortgage. *Id.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Colleen Pasquale and Ronald Pasquale pray for the following relief:

A.     An order declaring that Defendant Fitz Gerald's actions, as set out above, violate the Fair Debt Collection Practices Act;

B.     An order declaring that Defendant Influential Partners' actions, as set out above, violate the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act;

C.     An order declaring that all Defendants' actions violated the New Jersey Consumer Fraud Act;

D.     An award of injunctive and other equitable relief prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

E.     An order terminating the IP Mortgage;

F.     An award of statutory damages;

G.     An award of actual damages;

H.     An award of treble damages;

I.     An award of punitive damages;

J.     An award of reasonable attorneys' fees and costs; and

K.     Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

**Dated:** April 26, 2016                              */s/ Jeremy M. Glapion*_____
                                                         Jeremy M. Glapion
                                                         **THE GLAPION LAW FIRM, LLC**
                                                         1704 Maxwell Drive
                                                         Wall, New Jersey 07719
                                                         Tel: 732.455.9737
                                                         Fax: 732.709.5150
                                                         jmg@glapionlaw.com